IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| Michelle Fiscus, M.D., FAAP | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY DEMAND |
| Commissioner Lisa Piercey, | ) | |
| Tennessee Dept. of Health | ) | |
| (in her individual and official capacities), | ) | |
| Chief Medical Officer Tim Jones | ) | |
| Tennessee Dept. of Health | ) | |
| (in his individual and official capacities) | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.     Plaintiff Michelle Fiscus, M.D., FAAP, brings suit for injunctive relief and compensatory damages following her termination.  After Dr. Fiscus was fired, stigmatizing and defamatory statements made by Defendant Tim Jones to Defendant Lisa Piercey were published in several media sources.  When Dr. Fiscus formally sought a *Roth* name-clearing hearing, Defendants denied her request.  This suit timely follows.  Plaintiff brings a "stigma-plus" claim under 42 U.S.C. § 1983.

## PARTIES

2.     At all relevant times, Plaintiff Michelle Fiscus was a citizen and resident of Williamson County, Tennessee.  Following the events complained of in this lawsuit, Plaintiff has been unable to find comparable employment in the State of Tennessee and intends to relocate to the State of Virginia to pursue employment opportunities there.

3.     Defendant Lisa Piercey is the Commissioner of the Tennessee Department of Health.  She is sued in her official capacity for injunctive relief only, as she has the authority to provide a name-clearing hearing to Plaintiff.  She is sued in her individual capacity for compensatory damages as outlined below.  She may be served at 710 James Robertson Parkway, Nashville, TN, 37243.

4.     Defendant Tim Jones is the Chief Medical Officer of the Tennessee Department of Health.  He is sued in his official capacity for injunctive relief only, as he has the authority to provide a name-clearing hearing to Plaintiff.  (Defendant Jones authored the defamatory and stigmatizing memorandum complained of below.) He is sued in his individual capacity for compensatory damages as outlined below. He may be served at 710 James Robertson Parkway, Nashville, TN, 37243.

## JURISDICTION

5.     This action arises under the United States Constitution and under the laws of the United States of America, particularly under the provisions of the Fourteenth Amendment of the United States Constitution, and particularly under the Civil Rights Act, codified at 42 U.S.C. § 1983 *et seq.*

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events giving rise to Plaintiff's claims occurred in this District.

Case 3:21-cv-00686   Document 1   Filed 09/02/21   Page 3 of 25 PageID #: 3

## FACTUAL ALLEGATIONS

8. Dr. Michelle Fiscus was terminated from her executive service employment as the medical director of the Vaccine-Preventable Diseases and Immunization Program at the Tennessee Department of Health on July 12, 2021.

9. Three days after her termination, on July 15, 2021, several media outlets published a letter from Chief Medical Officer Tim Jones to Commissioner Lisa Piercey. (Attached as **Exhibit A**.)

10. This letter, dated July 9, 2021, purported to outline the reasons for the firing of Dr. Fiscus.

11. The defamatory material in the letter was the purported basis for firing Dr. Fiscus.

12. Curiously, the letter was not presented to Dr. Fiscus at her termination, nor was she made aware of its contents.

13. Before this letter was made public by the Dept. of Health and published in the media, Dr. Fiscus had never seen the letter or been given an opportunity to respond to its allegations.

14. Upon information and belief, this letter was sent to members of the news media at the direction of Defendant Piercey.

15. The decision to send the July 9 letter, unsolicited, to members of the news media was, upon information and belief, part of an intentional effort by Defendants to stigmatize and defame Dr. Fiscus.

4

16.     Following the letter's initial circulation, several news outlets filed public records requests for the letter, which the Dept. provided.

17.     The July 9 letter was also made part of Dr. Fiscus's personnel file by Defendants Piercey and Jones.

18.     Personnel files of executive service employees such as Dr. Fiscus are subject to disclosure under Tennessee's Public Records Act, T.C.A. § 10-7-503, *et. seq.*

19.     Further, upon information and belief, the July 9 letter was selectively disclosed.

20.     Dr. Fiscus's full personnel file, which included glowing performance reviews contradicting the memo's allegations, was not sent to the media.

21.     The disclosure of the July 9 letter to the news media constituted a voluntary disclosure to the public, especially when, as here, various news media published new stories regarding the letter's stigmatizing contents. *See Hade v. City of Fremont*, 246 F. Supp. 2d 837, 845 (N.D. Ohio 2003) (finding publication element satisfied where stigmatizing statements about plaintiff were made public through two newspapers and a public official was the source of information). *See also Naples v. Lowellville Police Dep't*, 125 F. App'x 636, 644 (6th Cir. 2005) (assuming "plaintiff could establish that placement of the memorandum in his personnel file entitled him to a name-clearing hearing.") *See also Golem v. Vill. of Put-In Bay*, 222 F. Supp. 2d 924, 935 (N.D. Ohio 2002) (finding publication supporting a defamation claim based on circulation of allegedly defamatory documents in plaintiff's employee file to potential future employer).

22.     A collection of news stories evidencing the publication of the July 9 letter is attached to this Complaint as collective **Exhibit B.**

23.     Several news outlets published the July 9 memo in full. *See* TENNESSEE JOURNAL, *Read the Health Department memo about why it fired Tennessee's chief vaccination official*, July 15, 2021, available at https://onthehill.tnjournal.net/read-the-health-department-memo-about-why-it-fired-tennessees-chief-vaccination-official/, last visited September 2, 2021.

24.     The letter contains several false, stigmatizing, and defamatory statements concerning Dr. Fiscus and her character for honesty and morality.

25.     These false and stigmatizing allegations include accusations of financial impropriety and self-dealing regarding Dr. Fiscus's role with ImmunizeTN, a non-profit whose mission is "to ensure all Tennesseans benefit from the protections provided by immunizations so that together we can achieve a healthy, thriving Tennessee free of vaccine-preventable diseases."

26.     Here, the letter charges Dr. Fiscus with "poor judgement and a substantial conflict of interest" in "providing funds" to ImmunizeTN, in which Dr. Fiscus has no financial interest whatsoever and serves only in an advisory capacity.

27.     In fact, Defendant Jones had previously praised Dr. Fiscus for her role in starting ImmunizeTN. In a February 5, 2019, performance evaluation, Defendant Jones wrote: "[Dr. Fiscus] has taken the initiative to start a statewide coalition [ImmunizeTN] which has been very successful." (**Exhibit C,** Rebuttal of Dr. Fiscus.)

28.    The charge that Dr. Fiscus had a "substantial conflict of interest" with ImmunizeTN was completely false, as Dr. Fiscus has no financial interest in ImmunizeTN; is not on the board of directors; is not on the payroll; and serves only in an ex-officio advisory capacity to the board.

29.    Further, Defendant Jones's complete about-face—suddenly accusing of Dr. Fiscus of financial self-dealing after praising her for her "highly successful" work with ImmunizeTN—was arbitrary and capricious.

30.    The letter further accuses Dr. Fiscus of sharing "a letter regarding her own interpretation of state and federal law with external partners with respect to vaccinations and other medical treatment of minors."

31.    In fact, Dr. Fiscus did no such thing, as the letter she shared included language taken verbatim from a memorandum provided to Dr. Fiscus by Grant Mullins, a Dept. of Health attorney.

32.    Grant Mullins provided Dr. Fiscus with this memorandum in an email dated May 6, 2021. (Attached as **Exhibit D**.)

33.    The email stated:

> Attached is the new summary of the doctrine that has just
> recently been posted to the website and is blessed by
> the Governor's office on the subject. This is forward facing
> so feel free to distribute to anyone.

```
From:          Grant Mullins
Sent:          Thursday, May 6, 2021 3:25 PM
To:            Michelle Fiscus
Cc:            Paul Petersen
Subject:       RE: mature minor
Attachments:   Mature Minor Summary 4.26.21.docx

Sure—Attached is the new summary of the doctrine that has just recently been posted to the website and is blessed by
the Governor's office on the subject. This is forward facing so feel free to distribute to anyone.

--Grant
```

34.     The memorandum attached to the email is still on the Dept. of Health's
website at the time of this filing.

(Available                                                                          at

https://www.tn.gov/content/dam/tn/health/documents/Mature_Minor_Doctrine.pdf,

last visited September 1, 2021.)  The memorandum was based on the Tennessee
Supreme Court's discussion of the "mature minor" doctrine in *Cardwell v. Bechtol*,
724 S.W.2d 739 (Tenn. 1987).  (Similarly, the Tennessee Attorney General issued an
opinion in 2003 regarding vaccination of minors, acknowledging that, based on
*Cardwell*, "minors have the capacity to consent to medical treatment without their
parents' approval if they are able to fully understand and appreciate the risks and
probable consequences of their conduct."  Opinion No. 03-087, July 10, 2003, available
at      https://www.tn.gov/content/dam/tn/attorneygeneral/documents/ops/2003/op03-
087.pdf, last visited September 1, 2021.)

35.     On May 12, 2021, Dr. Fiscus circulated a memo containing verbatim
language from the memo Grant Mullins had provided to her.  The memo was sent to

various vaccine providers in the State who had requested clarity on the issue of vaccinations for minors.

36. On May 17, 2021, Defendant Piercey sent a letter to Representative Robin Smith explaining the mature minor doctrine and specifically defending Dr. Fiscus's actions. (Attached as **Exhibit E**, Piercey Letter to Rep. Smith.) The letter specifically mentioned Dr. Fiscus by name and noted: "To help providers understand the law in Tennessee, Dr. Fiscus prepared a memo outlining the mature minor doctrine. The mature minor doctrine has been present in Tennessee since the 1980's and permits healthcare providers to treat certain minors without parental consent."

37. As political outrage over the mature minor doctrine and COVID-19 vaccinations spread, Defendant Piercey appeared before several state legislators on June 16, 2021, during a government operations meeting. At this meeting, several Republican legislators took issue with the mature minor doctrine and specifically associated that doctrine with Dr. Fiscus.

38. One lawmaker, Rep. Scott Cepicky, R-Culleoka, suggested dissolving the Dept. of Health over the perceived targeting of children for vaccinations.

39. One news story describing these events noted:

> The uproar stems, in part, from a memo by Dr. Shelley Fiscus, head of immunology in the department, to "vaccination partners" discussing emergency use authorization of the Pfizer vaccine . . .

TENNESSEE LOOKOUT, *Republican lawmakers threaten to dissolve Health Department over child vaccines*, June 17, 2021 (available at

https://tennesseelookout.com/2021/06/17/republican-lawmakers-threaten-to-dissolve-health-department-over-child-vaccines/, last visited September 1, 2021.

40.     Defendant Piercey faced intense political pressure to terminate Dr. Fiscus's employment because of the controversy surrounding messaging to parents and children on the issue of COVID-19 vaccinations.

41.     But Dr. Fiscus played no role in such messaging.  Nor did she play any role in the creation of the mature minor doctrine or the Dept. of Health's historical reliance on that doctrine.  In fact, the Dept. of Health continues to apply the doctrine as necessary for its activities.

42.     The July 9 memo created the false impression that Dr. Fiscus was a rogue employee with her own political agenda—rather than an employee dutifully circulating language from a legal memorandum provided by a Dept. of Health lawyer, who had specifically advised her the memo was "blessed by the Governor's office."

43.     On July 30, 2021, Counsel for Dr. Fiscus sent a letter to Grant Mullins and Defendants Piercey and Jones.  This letter formally requested a post-termination name-clearing hearing.  (**Exhibit F**, Name-clearing letter.)

44.     On August 5, 2021, Grant Mullins responded to Counsel for Dr. Fiscus with a one-sentence denial of the formal request for a name-clearing hearing:

> The Department is in receipt of Dr. Fiscus's request for a name-clearing hearing and associated demands.  Because she has not established the elements necessary to show entitlement to a name-clearing hearing, the request is denied.

(**Exhibit G,** Email from Grant Mullins to Plaintiff's Counsel.)

45. The email did not elaborate on which element Dr. Fiscus supposedly failed to establish.

46. The false, stigmatizing, and defamatory statements made by Defendant Jones have seriously damaged Dr. Fiscus's standing and associations in the community and adversely impacted her ability to find subsequent employment in the State of Tennessee.

47. Dr. Fiscus and her husband have placed their home for sale and are in the process of relocating to another state so that Dr. Fiscus will be able to pursue future employment opportunities.

48. This relocation is necessary because of the damage to her reputation in Tennessee, which has effectively foreclosed further opportunities to work in public health in this State.

49. Defendants Piercey and Jones, in their official capacities, possess the authority to provide Dr. Fiscus with a name-clearing hearing.

50. Each Defendant refused to do so and may be held liable for all damages suffered by Dr. Fiscus.

51. The right to a name-clearing hearing is well-established in the Sixth Circuit. *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002). *Mertik v. Blalock,* 983 F.2d 1353, 1362 (6th Cir. 1993) ("[W]hen a plaintiff alleges the loss, infringement or denial of a government right or benefit previously enjoyed by him, coupled with communications by government officials having a stigmatizing effect, a claim for deprivation of liberty without due process of law will lie.").

52.     Further, "where . . . the employer has inflicted a public stigma on an employee, the only way that an employee can clear his name of the public stigma is through publicity." *Gunasekera v. Irwin*, 551 F.3d 461, 470 (6th Cir. 2009).

53.     The July 30, 2021, letter from Dr. Fiscus's Counsel to Defendants put Defendants on notice that denying a name-clearing hearing to Dr. Fiscus would violate her constitutional rights under the totality of the circumstances.

54.     Nevertheless, Defendants chose to deny Dr. Fiscus such a hearing.

55.     Such conduct is not shielded from qualified immunity, because it was clearly established in this Circuit that denying a name-clearing hearing under the circumstances of this case would violate Dr. Fiscus's constitutional rights—her liberty interest in her good name and reputation—and that Defendants' single-sentence denial of that hearing, without explanation, was unreasonable.

**Muzzle controversy:**

**A deliberate effort to discredit Dr. Fiscus**

56.     Dr. Fiscus was technically fired on July 12, 2021.

57.     But, upon information and belief, the decision to terminate her was made on July 8, 2021, in a meeting attended by Defendant Piercey, leaders from the legislature's government operations committee, and a representative from Governor Bill Lee's office.

58.     Defendant Piercey went on vacation July 9, 2021, the next day.  This was the same day Defendant Jones authored the defamatory July 9 memo.

59.     On July 7, 2021, the day before Defendant Piercey made the decision to fire Dr. Fiscus, Dr. Fiscus arrived at work and discovered a package containing a dog muzzle on her desk.

60.     The package containing the muzzle had been delivered by Amazon.

61.     Confused, Dr. Fiscus asked Defendant Jones if he knew anything about the muzzle.  He said he did not.

62.     Dr. Fiscus mentioned the muzzle to other colleagues, including Dr. Paul Petersen in the Dept. of Health.

63.     Dr. Petersen contacted Tennessee's Dept. of Homeland Security out of a concern that the muzzle could potentially be a threat to a state employee.

64.     On July 8, 2021, the same day that Defendant Piercey decided to terminate Dr. Fiscus, Dr. Fiscus met with Homeland Security agents three separate times.

13

65.     Mario Vigil was assigned as the lead investigator.

66.     Mario Vigil's immediate past position was with Governor Lee's COVID-19 Unified Command Group.

67.     Homeland Security agents took the muzzle and Amazon packaging and said they would contact Amazon.

68.     Later that day, Homeland Security agents stated to Dr. Fiscus: "Amazon says you bought the muzzle."

69.     Dr. Fiscus did not send her herself the muzzle.

70.     Dr. Fiscus did not purchase or order the muzzle.

71.     Dr. Fiscus did not have any knowledge of any Amazon account or order relating to the muzzle.

72.     Dr. Fiscus has made a sworn statement under penalty of perjury attesting to these facts.  (Declaration of Dr. Michelle Fiscus, attached as **Exhibit H**.)

73.      Accordingly, Dr. Fiscus showed the Homeland Security agents her Amazon account order history that did not include the muzzle.

74.     Homeland Security agents then stated they would not be able to get further details on the muzzle without a subpoena; and further stated they would not be able to get a  subpoena because they did not view the potential threat as credible.

75.     Homeland Security agents did not attempt to obtain a subpoena from Amazon on July 8, 2021.

76.      On July 9, 2021, Defendant Jones sent the defamatory letter to Defendant Piercey, recommending Dr. Fiscus's termination.

77. On July 12, 2021, Dr. Fiscus was terminated.

78. But, as previously stated, none of the allegations in the July 9 letter was presented to Dr. Fiscus during her July 12 termination.

79. Only later, when the July 9 letter was deliberately disseminated by Defendants, did Dr. Fiscus discover these allegations.

80. Also on July 12, 2021, Dr. Fiscus penned a 1,200-word statement describing her firing as a political scapegoating. (TENNESSEAN, *Tennessee's former top vaccine official: 'I am afraid for my state'*, July 12, 2021, available at https://www.tennessean.com/story/news/health/2021/07/12/covid-19-tennessee-fired-vaccine-official-michelle-fiscus-fears-state/7945291002/, last visited August 26, 2021.)

81. Dr. Fiscus also appeared on national television, including CNN, on July 13, 2021, in the immediate aftermath of her firing.

82. That same day, Tennessee Republican lawmaker Jeremy Faison posted on his Twitter account regarding Dr. Fiscus. Rep. Faison retweeted a link to The View (@TheView), a popular daytime television show. (https://twitter.com/JeremyFaison4TN/status/1415026886732881921, posted July 13, 2021, last visited August 26, 2021.) The View aired a segment discussing the firing of Dr. Fiscus.



83. The tweet included the phrases: "Just wait" and the hashtag "wait for the rest of the story."

84. Two days later, on July 15, 2021, Defendants released the defamatory July 9 memo, as previously discussed.

85. Also on July 15, 2021, however, Mario Vigil at Homeland Security suddenly decided to obtain that subpoena from Amazon after all. (**Exhibit I**, Mario Vigil's Report.)

On July 15, 2021, I appeared in front of Davidson County Judge Ana L. Escobar to request that she sign a subpoena for Amazon to produce the real name, email address, billing information, and phone numbers relating to the account of the individual who sent the package, as well as the creation date for this account. Judge Escobar signed the subpoena and I electronically delivered it to Amazon via their Law Enforcement Request Tracker at approximately 12:15 PM on July 15, 2021.

86. Mario Vigil had apparently stopped his investigation after the firing of Dr. Fiscus on Monday, July 12, 2021.

87. That is, his report is totally silent as to any investigative steps he took on Tuesday, July 13 or Wednesday, July 14.

88. In fact, on July 14, Mario Vigil went to Dr. Fiscus's home and gave her the muzzle, indicating that his investigation was complete.

89. Nevertheless, the same day (July 15) that the Defendants leaked the defamatory July 9 memo, Mario Vigil decided to obtain the subpoena from Amazon regarding the muzzle—the subpoena he previously had stated he did not think he would be able to obtain because there was no credible threat to Dr. Fiscus.

90. On July 20, 2021, Mario Vigil received the information he had requested from Amazon pursuant to that subpoena.

91. That same day, Mario Vigil sent Dr. Fiscus a text message. It read:

Shelley, this is Mario. Messaging to see if you have availability to meet tomorrow afternoon [July 21, 2021] at 2 o'clock or after?

Dr. Fiscus responded that she was available. Later that evening, at 5:49 p.m., Mario Vigil texted Dr. Fiscus:

Sorry about taking so long to get back to you a couple of the things [*sic*] on another case have popped up so will [*sic*] not be able to get out to see you tomorrow. It is nothing pressing and as a schedule [*sic*] allows I'll get with you and see what free time you have.

(**Exhibit J**, Mario Vigil Text Messages.)

92.     Mario Vigil did not contact Dr. Fiscus again before finalizing his report. The meeting he attempted to schedule for July 20, but canceled, never occurred.

93.     Mario Vigil sent a subpoena to Intelliquent, a telecommunications services provider believed to be the carrier associated with the phone number on the Amazon account from which the muzzle was purchased.

94.     Intelliquent responded to Mario Vigil that the target phone number was in fact associated with a different company, TextNow, Inc.  Intelliquent provided contact information for where to send a law enforcement subpoena to TextNow.

95.     But Mario Vigil did not send a subpoena to TextNow.

96.     Instead, Mario Vigil sent only an evidence preservation letter.

97.     That is, Mario Vigil did not ask TextNow to provide the information he had subpoenaed from Intelliquent, which would have included "real name, address, email addresses, billing information, all credit card(s) related to said accounts, all alternate phone numbers relating to said account(s), and date of account(s) creation." (**Exhibit I**, Vigil Report, p. 11, Subpoena to Intelliquent.)

98.     Instead, Mario Vigil asked only that TextNow preserve, rather than provide, subscriber information, message logs, call logs, and IP logs.  (*Id.* at p. 32, Vigil Preservation Request to TextNow, Inc.)

99.     Having 1) not obtained any subscriber information from the cell phone provider of the phone number used to create the Amazon account associated with the muzzle; 2) not mentioned (or even discovered) that the credit card used to purchase

the muzzle had been lost and canceled over a year before the muzzle was purchased; and 3) not followed up with Dr. Fiscus, as he planned to do, to discuss the investigation, Mario Vigil nevertheless concluded that "there is no evidence to indicate that the dog muzzle was intended to threaten Dr. Fiscus."

100. The same day that the report was concluded, August 16, 2021, an online news outlet, Axios, published a story with the headline: "State investigation finds fired Tennessee vaccine official mailed dog muzzle to self."

101. The article was circulated widely. (The headline was later corrected to: "Scoop: Probe finds evidence fired Tennessee vaccine official bought dog muzzle sent to her.") (Available at https://www.axios.com/tennesee-covid-vaccine-fired-dog-muzzle-michelle-fiscus-b2419534-7e4a-4048-89b5-35300e8da333.html, last visited August 31, 2021.)

102. Upon information and belief, unknown actors mailed the dog muzzle to Dr. Fiscus and did so in a strategic manner to make it seem as though Dr. Fiscus had ordered, paid for, and mailed the muzzle to herself, when she had not.

103. A criminal investigation into the origins of the muzzle is currently pending in the Metro Nashville Police Dept. at the time of filing.

104. Dr. Fiscus personally requested the police investigation by Metro Nashville Police.

105. Plaintiff needs the benefit of discovery to obtain the identity of these unknown actors.

106. Prior to filing suit, Plaintiff attempted to obtain a fully unredacted copy of the Mario Vigil report via a public records request to the Dept. of Safety.

107. The Dept. has refused to provide the unredacted report that may contain potentially exculpatory information, such as IP addresses associated with the Amazon account and the purchase of the muzzle.

108. In addition, to investigate the circumstances and events surrounding her firing and the muzzle, Plaintiff's attorneys filed formal records requests under the Tennessee Open Records act seeking emails and texts from persons who may have knowledge of these facts and events.

109. Rather than producing the records or waiving any charges to obtain these records, the information was withheld unless a charge of $654,241.95 was paid in advance. (**Exhibit K,** Public Records Cost Estimates.)

110. Plaintiff's attorneys requested that Commissioner Piercey waive these fees, as she has the power to do. Defendant Piercey, through the Office of the Attorney General, declined to do so. (**Exhibit L,** Request for Fee Waiver and Denial Letter.)

111. The muzzle controversy was a further effort to discredit Dr. Fiscus and malign her reputation.

112. The investigation by the State was inadequate. The report generated by Mario Vigil omitted several key facts, most notably that the credit card used to purchase the muzzle had been canceled for over a year because it was lost. (**Exhibit B**, Dec. Michelle Fiscus, ¶¶ 18-21.)

113.   Plaintiff's investigation into the source of the muzzle and those malicious actors responsible has been thwarted by Commissioner Piercey's refusal to waive the exorbitant fees quoted for public records.

114.   This investigation has similarly been undermined by the Dept. of Safety's refusal to provide an unredacted copy of Mario Vigil's report.

115.   Nevertheless, Plaintiff's investigation has yielded information that a well-known Republican political operative previously described how he sent a political opponent a muzzle.

116.   Thus, there appears to be a precedent for exactly the sort of political sabotage tactic to which Dr. Fiscus was subjected.

117.   At the time of this filing, the issue of the muzzle is relevant to the reputational harm Plaintiff has suffered because of her firing and her public defamation by Defendants.

118.   Plaintiff thus reserves the right to amend this Complaint in conformity with the evidence to assert potential claims of civil conspiracy, retaliation, and substantive due process violations.

119.   Significant information in the form of calendars, emails, text messages, and other documents needed to develop these claims is peculiarly in the possession of the Defendants, who, particularly as to Defendant Piercey, have refused to provide that information.

**CAUSE OF ACTION:**
**Violation of Fourteenth Amendment liberty interest in one's good name and**
**reputation**
**("Stigma-plus")**
**(42 U.S.C. § 1983)**

120.   Plaintiff incorporates by reference all allegations contained in the paragraphs above.

121.   Defendant Tim Jones made stigmatizing statements in conjunction with the termination of Dr. Fiscus's public employment.

122.   These statements went beyond falsely alleging merely improper or inadequate performance.

123.   Instead, these statements impugned Dr. Fiscus's character for honesty and morality—casting her as a rogue political operative pursuing her own agenda and as a self-dealing grifter of the public purse, seeking to divert government funds to an organization in which she had an unethical material financial interest.

124.   Such charges, in addition to being utterly and completely false, go well beyond alleging mere inadequate performance.

125.   Defendant Piercey received the July 9 letter containing these stigmatizing statements and then ensured the release of that letter to selected members of the news media.

126.   This voluntary public disclosure by Defendant Piercey was part of an intentional effort to stigmatize Dr. Fiscus.  (While such intentionality is not an element of a cause of action for violation of the liberty interest in reputation, it is relevant to the issue of punitive damages, to which Plaintiff is entitled.  *Smith v.*

*Wade*, 461 U.S. 30, 56 (1983) ("a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.").)

127. Defendants Piercey and Jones also caused the defamatory letter to become part of Dr. Fiscus's personnel file, a public record under Tennessee law available for anyone—reporters, future employers, etc.—to view.

128. The contents of the letter were published by several news outlets and widely disseminated.

129. Following this dissemination and discovery of the July 9 letter, Plaintiff, through Counsel, formally demanded a name-clearing hearing to respond to the baseless, false, stigmatizing, and defamatory allegations.

130. This letter was addressed to Defendants Piercey and Jones, each of whom possesses the authority to provide such a name-clearing hearing.

131. Defendants, through their Counsel, denied Plaintiff's request for a name-clearing hearing on August 5, 2021. Plaintiff's cause of action for injunctive relief and monetary damages accrued on that date, as "the right to recover arises from the denial of a hearing to refute the charges ... [thus], the extent of the publication would be relevant only to the amount of damages suffered." *Quinn v. Shirey*, 293 F.3d 315, 320–21 (6th Cir. 2002).

132. This denial came in the form of a summary, conclusory, one-sentence email that did not provide a detailed reason for the denial.

133.    As a result of the widespread publication of the defamatory allegations attacking her character, Plaintiff has sustained and continues to sustain damages as listed below.

## DAMAGES

134.    As a result of the conduct of the Defendants, Plaintiff has suffered:

a.  Serious mental and emotional distress;

b.  Loss of employment;

c.  Loss of retirement benefits;

d.  Loss of enjoyment of life;

e.  Diminished reputation and standing in the community;

135.    WHEREFORE, Plaintiff requests:

a.  That a jury be empaneled to try this case;

b.  A declaratory judgment that Defendants' conduct violated Plaintiff's protected constitutional rights;

c.  Punitive damages;

d.  Compensatory damages in an amount to be determined at trial;

e.  Reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988;

f.  An injunction ordering Defendants to provide the name-clearing hearing to which Plaintiff is entitled; and

g.  Such other relief as the Court deems equitable and just.

Respectfully submitted,
DAVID RANDOLPH SMITH & ASSOCIATES

By: /s/ Christopher W. Smith
Christopher W. Smith, TN BPR #034450
David Randolph Smith, TN BPR #011905
Dominick R. Smith. TN BPR #028783
W. Lyon Chadwick. Jr. TN BPR #029599
1913 21st Avenue South
Nashville, Tennessee 37212
615-742-1775
csmith@drslawfirm.com
drs@drslawfirm.com
dom@drslawfirm.com
lyon@drslawfirm.com

*Attorneys for Plaintiff*